The next case on our calendar is the Retirement Board of the Policeman's Annuity and Benefit Fund v. FXCM. Thank you. Good morning, you may proceed. Good morning, Your Honors. May it please the Court, my name is Deborah Clark Weintraub and I represent the Plaintiff Appellant Retirement Board of the Policeman's Annuity Fund of Chicago. The District Court's decision dismissing this action for failure to plead the requisite strong inference of scienter should be reversed and this Court should sustain the complaint on its de novo review. Contrary to the decision of the District Court, the facts alleged in the complaint give rise to the requisite strong inference that the defendants knew or recklessly disregarded that the defendants had made materially false and misleading statements regarding the riskiness of FXCM, Inc.'s business model. Moreover, since the judgment was entered in the District Court, there's been significant newly discovered evidence revealed in a series of settled regulatory proceedings against FXCM and the defendant, Dror Niv . . . I'm glad you raised that so I didn't have to be again the one to say I have a threshold question. Okay. It seems to me your best arguments suffer from two defects. They're in your reply brief for the first time and they're based on things that aren't in the record. Now, if both of those are right, why are we here? Why didn't you dismiss this appeal without prejudice to reinstating it after your motion for reconsideration that relied on these new arguments and new materials in the District Court? Well, first let me say that the regulatory proceeding issues were first addressed in the reply brief because those settlements occurred after the initial brief. The settlements occurred, some of them occurred, I think, after the initial brief, but the charges had been brought certainly prior. Well, Your Honor, that is true, but the allegations in the complaint in the enforcement proceeding that was filed in the Southern District were on technical violations of the CFTC procedures. What is the new evidence that we're relying on in connection with our appeal is the investigative testimony and internal FXCM documents that were filed in that enforcement proceeding, not the . . . Did the District Court have a shot at that first? Well, Your Honor, we . . . Did you consider it for the first time? Forgive me, Your Honor. We did file a rule . . . we did file a motion in front of the District Court for an indicative ruling and a motion to amend and under Rule 60b-2 that the District Court has not taken any action with respect to that motion. That motion is still sitting in the District Court. Nevertheless, we believe, based upon the law incited in our brief, that this Court can take judicial notice of the CFTC enforcement orders that were entered and also take judicial notice of the materials that were filed in the Southern District of New York in the case before Judge Forrest. And that's why . . . There's something that strikes me amiss about your adversary never having had a chance before in this Court to respond to any of the things that form your strongest arguments until the ten minutes we've allocated today. And it seems to me there ought to be a solution for that. Well, Your Honor, again, they will address, I'm sure, the issues before the Court this morning, and they have addressed the issues before Judge Wood in response to the motion that we filed for an indicative ruling in pursuant to Rule 60b-2. Leaving that material aside, what is it that you have pled with the requirement of 9b,  you make a general argument that this was riskier than they said, but riskier than what? I mean, they do have a different situation than the people who are trading themselves. And most of what they say is we are less risky than people who are trading themselves. They're not saying in some overall sense this isn't also a risky business in some way. So I find that argument . . . The point that could have been raised is that the specific position at that specific time with respect to the Swiss franc had become something so dramatic that that should have been told, and that they had enough knowledge of that. But I've looked hard and fast on your complaint to find where you make that claim, and you don't really make it. I mean, you talk about the risk factors at A49, and then at a certain point, including for the URCF, that this is part of the general risk of the business. The nearest thing you come to it is that when you said there have been no material changes that they said, and in a way there is no material change. This holding of Swiss francs by people had been there for a long time, and then you say that had become highly leveraged and so on. That's the nearest thing you come to focusing directly on what is the real key to this, that they were holding, that their clients were holding a huge amount at a certain time, and that probably a sensible business would have said that. But I don't see in your complaint anything that says that. You were allowed to amend. The court said, would you like to amend? And you didn't amend to specify. Now, that's my problem. There was a lot in there, Your Honor, so let me just take it very quickly since the light is going off. There are two aspects of the risk that was not disclosed, and one of them, Your Honor, has just articulated, which is the enormous one-way bet that FXCM made on the Swiss franc-euro pair. And that is in our initial complaint that was dismissed by Judge Wood, and I would refer the Court to the section on page 12, it's 828 of the appendix, which talks about FXCM's $1 billion bet on the euro-Swiss franc pair. And let me just point out that at the time the complaint was filed, we believed that bet to be $1 billion based upon the defendant's own SEC filings. The materials that were filed in the CFTC enforcement action in front of Judge Forrest, here in the Southern District, revealed that the bet was not $1 billion. It was more than twice that. It was $2.2 billion. But that is an aspect of why we say that there was sufficient facts in the complaint to find that the statements regarding the risk of the model was misstated. But we also argued... This goes again to the risks involved in this general model. It doesn't go to the specifics of this particular risk. We'd have to find with you that the statement about the risk of the model was so incorrect as to show motive, recklessness, and so on. Yes, Your Honor, and with respect to the model, Your Honor prefaced your remarks by saying their risk was somehow different, and that's the whole point, Your Honor. It was not. They had market risk. Even though the defendants repeatedly denied to the market that they had market risk from the bets that the customers were making, they did because they entered into two separate transactions every time the customers made a trade. FXCM took the other side of its customers' transaction, and then it simultaneously entered into a second transaction with the bank, with the liquidity provider. And because FXCM had this no-debit policy where they had guaranteed they would not pursue the customers for more than the margin amounts of their account, they were on the hook. FXCM was on the hook. That's the risk of their business, and it is a different risk from the risk of a direct trader. And the question is, can one read what they said as to lie about this fact when they said that this was a less risky business than the business? It doesn't mean it wasn't risky, that it was just not the business of a direct trader. The misstatement, Your Honor, was even more precise. They precisely said, we do not have market risk. We are not exposed to the change in the market level of a position moving up and down. That's what they said, and that was absolutely not true. This risk they were taking was not credit risk. It was not counterparty risk. It was market risk. And they repeatedly said it wasn't because they wanted to portray the business as less risky than the ordinary business. But all the transactions that you describe were revealed. None of those were secret, were they? The transactions that FXCM made after a trade, after a customer chose to buy shares or currency? No, Your Honor. I don't think anybody had, given the risk disclosures that they made, and I would urge the Court to look very carefully at the risk disclosures that were made by the defendants because if you look at them in context, they were not specific disclosures that FXCM was taking market risk with respect to these trades. They talked about competitiveness. They talked about if there wasn't liquidity in the market, we won't be as competitive as our fellow... How about this from the 10Q? These methods may not adequately prevent losses, particularly as they relate to extreme market movements like if the Swiss National Bank were to lie about its monetary policy, which may be significantly greater than historical changes in market prices. And I could go on. Isn't that apprising people of a market risk? No, Your Honor. Again, they're talking about a volatility in the market. Here, this was a specific risk that arose from the lifting of the cap on the Swiss franc-euro currency pair. Have you ever heard the phrase nobody expects the Spanish Inquisition? Isn't that what this was? This was three days before they decoupled. The Swiss bank lied to the public and said this isn't going to happen. You're holding these defendants responsible? This case is not about whether or not they could have predicted when the Swiss bank was going to remove the cap. This case is about whether or not they misrepresented the risks of their model, and they absolutely did that, Your Honor, by denying that they had any market risk, even though they absolutely were the party on the hook in the event that there was a market loss with respect to these trades. And there's nothing in the CFTC proceedings make clear. These defendants have nothing but a history of deceit as to all of their constituencies, the regulators, the customers, and the investors. This is not a company... General history of deceit does not say whether they specifically lied with respect to this. That's a different issue. And this question of what it is in this CFTC that is material or not, assuming it is admissible, assuming it is before us now, and so on, is another question. But the fact that these are not nice guys or nice guys or whatever isn't really the issue before us. The issue before us is did they lie in the way... And again, I come back to my problem that where I think they have had a duty was to say specifically, look, we've got an awful lot of Swiss francs out there that may hit us because that was something that had come. But that, again, I don't see in your complaint with the 9b requirement that you're making that point. Well, there we are. You can answer if that was a question. If not, your time has expired, but you are reserved 2 minutes for rebuttal. Let me come back up for rebuttal then. That's good. Now we'll hear from FXCM and others. Good morning, Your Honors. May it please the Court. My name is Paul Blissett, and I represent the Defendant Appellees, and it's our position that this Court should affirm the dismissal because plaintiffs failed to meet the heightened cleaving standard on the element of scienter, which District Court Judge Wood found, both in terms of a lack of motive and opportunity and severe recklessness for the statements it made about its business and its trading. But what about all those insider trades that Mr. Landy made in time to make a lot of money, which is the motive? Well, Your Honor, CFO Mr. Land, 18 months before the de-pegging of the currency, sold some number of shares amounting to $2 million or $3 million, whereas the CEO, Mr. Niv, didn't sell one share throughout the class period and lost $110 million. And knowing under San D'Andre that some small sales can't really bolster a scienter inference when you have a CEO who didn't sell at all and lost that magnitude of money, I think the plaintiffs recognized that and started to bring in the sales of actually two non-defendants. Who were also insiders. Who were insiders, but who were not tied to the fraud whatsoever, and plaintiffs conveniently forgot to allege, and we pointed out in our briefs, that collectively those two non-defendants also lost money in the magnitude of $140 million. Altogether, those three lost close to half a billion dollars. Clearly, they did not see the risk coming that plaintiffs keep talking about. Judge Wood noticed that there's no motive here. And the plaintiffs pretty much acknowledged that because they put it at the end of their brief and slap a disclaimer on it and say, we're not really relying on that. It clearly cuts against them on motive. So then, the real question... I tend to agree with you that the motive isn't here because these were fraudsters. They were such bad fraudsters. They lost hundreds of millions of dollars. But still, what about the kind of reckless disregard that can be the equivalent of intentional deceit, indicated in part by the fact that two of your competitors did hedge this possibility and apparently escaped the debacle as a result? Well, Your Honor, okay, good question. There is no severe recklessness here at all. This company disclosed the exact risk that caused the losses. In its every 10K, fully disclosed that its agency model was such, and either they do not understand the SEC filings or haven't read them, but there is no market risk. Market risk is a defined term in foreign exchange trading that you suffer the risk of the gain or loss on a trade based on the market price. FXCM had offsetting trades. It was market neutral. It had counterparty or credit risk, which is another defined term, which is if the counterparty doesn't fulfill its obligations, there could be risk there, and that is exactly what happened here. FXCM disclosed that in the remote event that there is an extreme volatility in a suspension or lack of liquidity from the liquidity providers, they may not be able to close out the positions and suffer losses. I'm with you, but didn't they have a duty? Once the situation became what it was in the Swiss franc and some confidential people told them this is dangerous and the competitors were acting, although I don't put much weight on that, in a particular way to say here is a situation where what is normally not any different risk than what we've told you, where it becomes something that could be dramatic if the Swiss are lying. So my question is, did they allege that as a thing in their complaint? And I was trying to get her to tell me that they did and she sort of went around it. The nearest thing that comes to it is where in fact defendants had knowingly assumed catastrophic and foreseeable credit liquidity, operational and regulatory capital risks in connection with the company's one-sided, highly leveraged $1 million bet on the EURCF and failed to disclose these risks in the Form 10-Q. That's the nearest. And that may be enough. What cuts against it is there have been no material changes in the company's risk factor, which is a background of saying that. So the question for me is, is that enough to meet a 9b complaint? It is not, Your Honour, and the reason is context. Plaintiffs do not disclose the context. In the initial complaint, or the amended complaint, it's a billion-dollar long bet on the EURCF pair. And then with the recent materials that, again, are outside the record, it jumps to 2 billion. The context is, FXCM traded trillions of dollars per year on 59 different currency pairs. In the fourth quarter of 2014, the last quarter before the de-pegging, it was $1.4 trillion of trades on 59 currency pairs. If you just do the math, that's about $8 billion on 59 currency trades. A 1 billion or 2 billion position is not extraordinary. There's no context here, but those numbers come right out of the SEC filings. They don't provide the context. They scream with exclamation points of 1 billion or 2 billion. But in context, there is no significant risk. And what the company was warned about by CW1 was potentially the de-pegging was going to happen. Well, everybody knew that because the Swiss National Bank, when they put it in, said it was temporary. But they provided the head fake, Your Honour, as you said. Days before, they said this was a cornerstone of the Swiss monetary policy, and then they pull it. And most Forex traders didn't either. This is why we call it a black swan event, because... Right, right. And the other part of the context, Your Honours, is when the peg was put in place in 2011, this was, even plaintiffs acknowledge, the largest and fastest change in the currency price of any G10 country up till that point. And it was a 9% price move. And the seatbelt technology of FXCM handled that fine. There were no losses. The liquidity was there, and its business model functioned. So what was the company and Mr Nibs supposed to think when one of its people say, well, the peg may get de-pegged, it may get moved. Well, another 9% move would be fine. But he even said something less. He said 100 pips, which is 1% move. He was forecasting a 1% move and said it may be down the road. Even if, at most, the company thought it would probably be a 9% move or similar, their technology and their seatbelt trading technology had already worked. They had a track record with that level of volatility. Each currency change is different from another. And you don't think that these experts could have predicted that if the Swiss franc got de-pegged with the exposure that they had, that that would be that big a loss? No, Your Honor, because it's the timing, the manner, and the impact in the way it was done. The timing with the head fake saying that we weren't going to do it. The manner doing it completely with pulling the peg without a floor or some step down caused a market crash and a suspension of liquidity that nobody saw coming. To the magnitude of 10,000 pips, that's what happened. No one predicted that. It was unpredictable, unforeseeable. The company disclosed the risks of its business model that in a normal market event, we can handle things. But in the event of what happened, which is extreme volatility and a suspension of liquidity, we may suffer losses, which unfortunately, that's what happened. So with that, Your Honor, I think to your original question, no, the company was not, there were no risks that it was aware of that it did not disclose. It disclosed the very risks that caused the losses, which takes this case out of the AIG case that plaintiffs cited and the JNCO solar cases, in which both of those cases, the companies did not disclose some risks and the market event that happened, especially in AIG and the credit default swaps, was foreseeable. None of those are applicable here. This was a black swan event, and it really isn't just that. It is, the issue should be, was the company aware that an event might happen where its seatbelt technology would not work and it would suffer losses, and did it disclose that? And the answer is yes, it disclosed that these could happen. It's a remote risk, but even the materialization of a remote risk doesn't equate with scienter under this circuit's jurisprudence. Thank you, counsel. Thank you, Your Honor. Ms. Clark-Weintraub, you have reserved 2 minutes for rebuttal. It's better answering him than answering me. Why don't you talk about the last point opposing counsel made, that they disclosed the risk. Your Honor, they absolutely did not disclose the risk because they repeatedly denied that they had market risk. And as I said before, FXCM was the party that was on the hook for the losses in the event that there were losses. Wait, wait. He said market risk is a term of art and that they had a different risk, which is a term of art. Now, is that incorrect? Yes, that is absolutely incorrect. Market risk, when they use the term market risk, they defined it as the risk of exposure from the price of the position moving up and down. That's market risk. From the volatility. Is that right? Exactly right, Your Honor. So this is not credit or counterparty risk. This is a very, very important distinction. And they use these terms in this manner in order to persuade investors that they did not have the same level of risk as, for example, a dealer, as Your Honor was mentioning earlier. They try to distinguish themselves from their competitors by saying... They don't have the same level. They do have a significant risk, but it is not the same risk as somebody who is buying and selling. It is different. I respectfully disagree, Your Honor, because of the large amount of leverage that is used in this kind of trading. Because the price movements, the FX price movements, are so minuscule, you have to trade with a large amount of leverage in order to make it meaningful. And so the margin that these customers were depositing was very insignificant compared to the size of the bets that they were placing. And because of the no-debit policy, it was FXCM that held the risk. Isn't that simply going to the fact that there is a risk? I want to find out if this risk is the same as the risk of people who are trading. People who are trading are losing money all the time in catastrophic ways. They lost it catastrophically here. Is it the same risk? They suffered more losses as we recite in the complaint than anyone else. And yes, Your Honor, I would respectfully submit it is the same risk. It is market risk. And it may be that in certain situations, their technology was such that it helped them to avoid it. But here, where they had a $2.2 billion long euro bet, where when the cap was removed, whenever that was, and again, we're not arguing that they had a duty to predict when the cap was removed. What we're saying is that when the cap was removed, as it certainly would be at some point in time, the price of the Swiss franc was going to appreciate against the euro, and FXCM was going to be left holding the bag because no matter— Didn't the market understand that before the Swiss National Bank would allow that to happen, there would be some preview? There would be saying something like, you know, we are considering doing this the way a national bank or reserve bank does. And there would be a lead-up time in which the market would adjust to take account of the fact that the cap was coming off, rather than three days before it comes off, they say we're never taking it off. It doesn't matter, Your Honor. The issue is whether or not they lied about their model and how risky it was. That's the issue in the case. Counsel is addressing, you know, this was a surprise to the market. It doesn't matter. The issue is were they truthful when they told investors, we don't have market risk. We have all of these systems in place. They protect us. That was not true. And it wasn't true because they had built up this enormous $2.2 billion long bet on this volatile currency pair. And those are facts that can't be denied. And counsel referred to the seatbelts. The seatbelts worked. They prevented the customers' trades from being completed at these dislocated market prices. The only loss they suffered was the market loss they were exposed to all along, the 14 or 15% difference in the price. That was the loss they suffered at the end. Thank you. Thank you both very much. Very interesting case. We'll reserve decision.